**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| Jonathan W., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 3:22-cv-50388 |
| v. | ) | |
| | ) | Magistrate Judge Lisa A. Jensen |
| Kilolo Kijakazi, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Jonathan W. brings this action under 42 U.S.C. § 405(g) seeking a remand of the decision denying his disability insurance benefits.[1] For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded.

**I. Background**

In October 2013, Plaintiff was found disabled beginning in March 2011 because of tonsillar cancer and subsequent surgery, chemotherapy, and radiation treatment. Plaintiff's cancer has been in remission since December 2013, but Plaintiff continues to complain, in part, of headaches, fatigue, and chronic pain. An administrative law judge (ALJ) issued a decision in June 2019, finding that medical improvement occurred on February 1, 2018, and that Plaintiff was no longer disabled. Dkt. 21–32. Plaintiff subsequently challenged the ALJ's decision in the district court. In September 2020, pursuant to the parties' agreed motion, the case was remanded for a new decision. R. 1640.

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c). Dkt. 5.

1

Following another hearing, a new ALJ issued a decision in August 2021 finding that Plaintiff was no longer disabled as of February 1, 2018. Dkt. 1654–69. However, the Appeals Council remanded the ALJ's decision. Dkt. 1681–83. The Appeals Council instructed the ALJ to further consider the medical opinions, Plaintiff's allegations regarding headaches and fatigue, Plaintiff's mental impairments, Plaintiff's maximum residual functional capacity (RFC), and if warranted obtain supplemental evidence from a vocational expert (VE).

Accordingly, on June 21, 2022, Plaintiff testified at another hearing before the same ALJ. The ALJ also heard testimony from a new vocational expert.[2] The VE testified that given Plaintiff's age, education, work experience, and RFC, he would be able to perform the following unskilled, light jobs: sorter (DOT 222.687-022) with 100,000 jobs nationally; marker (DOT 209.587-034) with 130,000 jobs nationally; and assembler (DOT 706.687-010) with 12,000 jobs nationally. R. 1546. In determining the approximate number of full-time jobs for each of these Dictionary of Occupational Titles (DOT) jobs, the VE testified that she relied on her professional experience and training, the information and descriptions in the DOT, data in the Bureau of Labor Statistics (BLS), and the data in Job Browser Pro (also known as SkillTRAN, the name of the company that produces it). R. 1547.

In response to questions from the ALJ, the VE testified that her sources were reliable because they were peer reviewed and widely used in the industry by vocational professionals. R. 1547–48. The VE also testified that her sources were reliable based on her experience in placing people into jobs. The VE testified that she attended many conferences on using the BLS and Job Browser Pro. R. 1548. The VE explained that she had the most up to date software program for

---

[2] Prior to the hearing, Plaintiff's counsel filed a brief, pointing out that the ALJ must ask the VE to explain the methodology behind their job number estimates. R. 1988–89.

Job Brower Pro, which utilized BLS data from March 2022 to approximate the number of full-time jobs for specific DOT job titles.

In response to questions by Plaintiff's counsel, the VE testified that the job numbers she provided for the assembler position were for one particular DOT code, explaining as follows:

> So there is no way – or there is – the Bureau of Labor Statistics does not count jobs at the DOT level. They do count jobs at the SOC level, at the Occupational Groups level. So SkillTRAN has to look at that information to see what types of, based on the description of the hypothetical, in what industry those jobs are performed in order to provide numbers of DOT codes that would be performed in different industries, different in the ICF code. And then there's a way to determine the number of jobs that exist in that industry, to come up with an approximate number of jobs that would be related to that particular DOT code. So – and that is the adopted way by vocational professionals to understand. We all know and realize that there is no source or document out there currently counting the number of jobs in the labor market for DOT.

R. 1554. Plaintiff's counsel then asked the VE if any of her training illustrated how the program estimates jobs for a particular DOT job according to the limits of a hypothetical. The VE responded, "They're giving you different examples of how to estimate employment for a DOT occupation based on certain types of parameters, whether it's light and it requires handling infrequently, on a frequent basis, not constant basis. You know that it's unskilled jobs. Those are the types of things that we, as experts, know about different types of jobs in the DOT and then select the jobs in the DOT." R. 1556.

Plaintiff's counsel then asked the VE about her familiarity with SkillTRAN's method. The VE noted that information on how SkillTRAN comes up with their numbers was available at conferences, in the 10-page document published by SkillTRAN, webinars, and videos and training available on SkillTRAN's website. Plaintiff's counsel asked if the VE understood how SkillTRAN estimated its jobs numbers. The VE responded yes. When Plaintiff's counsel proceeded to continue his questioning, the ALJ concluded the hearing over counsel's objection and told counsel to file a

brief. Plaintiff's counsel filed a post-hearing brief, which challenged the reliability of the VE's job number estimates. Specifically, Plaintiff's counsel challenged the VE's failure to explain why the job numbers she derived from SkillTRAN were reliable and how her experience was used to substantiate her job numbers, the premature ending of his cross-examination of the VE, use of the equal distribution method, and the discrepancies between the descriptions in the DOT jobs identified and those outlined by SkillTRAN. R. 1990–97.

On August 2, 2022, the ALJ issued another decision again finding that Plaintiff was no longer disabled as of February 1, 2018. Dkt. 1492–1513. The ALJ concluded that Plaintiff had the RFC to perform unskilled, light work with certain restrictions. In her decision, the ALJ overruled Plaintiff's objections to the job number estimates and relied on the VE's testimony to find that significant jobs existed in the national economy that Plaintiff could perform. The ALJ found that the VE's testimony was consistent with the DOT and that she used reliable sources to calculate her job numbers. R. 1511; R. 1512 n.4. The ALJ also stated that:

> The VE confirmed she had been trained in various ways on BLS and [SkillTRAN/Job Browser Pro]. She noted that those publications are peer reviewed, she thinks the publications are reliable, and she uses the most updated programs available. She added that the available job numbers used was recently released in 2022 and are specific to the DOT titles informed.

R. 1511. Based on the VE's testimony, the ALJ determined that Plaintiff could not perform his past relevant work, but there were other jobs that existed in significant numbers in the national economy that he could perform, including sorter, marker, and assembler.

After the Appeals Council denied Plaintiff's request for review on September 9, 2022, R. 1481, Plaintiff filed the instant action. Dkt. 1.

4

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (quoting *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

## III. Discussion

Plaintiff appeals the ALJ's most recent decision, arguing that the ALJ erred in relying on the VE's testimony to find that there were a significant number of jobs in the national economy that Plaintiff could perform. Plaintiff also argues that the ALJ failed to properly evaluate his subjective symptoms, the medical opinion evidence, and his RFC. This Court agrees that the ALJ's determination that Plaintiff could perform a significant number of jobs in the national economy is not supported by substantial evidence and requires a remand.

The Commissioner has the burden to show that work exists in significant numbers in the national economy that Plaintiff can perform. *See* 20 C.F.R. § 404.1594(f); *Davis v. Shalala*, 94 C 4162, 1995 WL 54449, at *3 (N.D. Ill. Feb. 7, 1995); *see also* 20 C.F.R. § 404.1560(c)(2); 20

C.F.R. § 404.1512(b)(3); *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008). If the ALJ relies on the testimony of a VE for those estimated job numbers, "substantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of a reliable methodology." *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022); *see Chavez v. Berryhill*, 895 F.3d 962, 969 (7th Cir. 2018) ("[A]ny method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability."). "A methodology is reliable when it is based on 'well-accepted' sources and the vocational expert explains her methodology 'cogently and thoroughly.'" *Ruenger*, 23 F.4th at 763 (citing *Biestek*, 139 S. Ct. at 1155). Accordingly, "when, as here, the claimant challenges the job-number estimate, the ALJ must compel the vocational expert to offer a 'reasoned and principled explanation' of the methodology she used to produce the estimate. *Chavez*, 895 F.3d at 970. The expert's explanation must be sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Ruenger*, 23 F.4th at 763 (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

ALJ's often face challenges to VE job number estimates because they tend to refer to specific jobs by the names and numbers identified in the DOT. However, the DOT does not provide job number estimates. The BLS provides such data but does so based on broader occupational and industry categories than the DOT. Accordingly, VEs must estimate the number of jobs available for a specific DOT job based on estimates for these broader categories of jobs. *See Chavez*, 895 F.3d at 965–66 ("The use of one system to supply the job titles and another to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist."); *see also Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020) ("Because the [DOT] is so outdated, an expert's

6

methodology for connecting job titles to reliable estimates of the number of jobs for each [job] title is especially important.").

Here, Plaintiff does not challenge the VE's sources for her job numbers, despite the Commissioner's argument to the contrary. Accordingly, this Court agrees with the Commissioner that SkillTRAN can be an appropriate source for a VE's job number estimates. Instead, Plaintiff argues that the VE failed to sufficiently explain her methodology despite identifying the sources she relied on. *See Albright v. Kijakazi*, 1:20-CV-438-JPK, 2022 WL 669897, at *7 (N.D. Ind. Mar. 4, 2022) ("[T]he issue here is not whether SkillTRAN is reliable as a matter of law, but rather whether the VE's testimony in this case, drawing in part on the SkillTRAN data, was sufficient to sustain the agency's step five burden."). Nevertheless, the Commissioner maintains that the ALJ thoroughly explained her method, stating that the VE made clear that she used "Job Brower Pro (method) based on BLS statistics (data) to calculate jobs by each DOT code (source) to provide three jobs with specific numbers in the national economy the plaintiff could perform." Def.'s Resp. at 5, Dkt. 17.

Although the VE is not required to "reveal the precise mechanics and statistical model involved," *Bruno v. Saul*, 817 Fed. App'x. 238, 243 (7th Cir. 2020) (unpublished), the VE must "provide some modicum of confidence in its reliability." *Brace*, 970 at 822. The Court finds that the VE failed to explain her method such that the ALJ, or this Court, could determine whether her method for determining job numbers was reliable. Even though it was clear that the VE relied upon Job Browser Pro, which utilizes the BLS data, the VE failed to explain how she used Job Browser Pro, or any other method, to calculate her job numbers and why she thought that method produced reliable job numbers. *See Westendorf v. Saul*, No. 19-CV-1019-JDP, 2020 WL 4381991, at *3-4 (W.D. Wis. July 31, 2020) ("Job Browser Pro might be a useful tool, but the VE needs to be able

to explain how Job Browser Pro makes its job number estimates, how she used the software to generate her own estimates, and why she believes those estimates are reliable.").

For example, did the VE adopt SkillTRAN's job numbers outright? Or did she reduce SkillTRAN's numbers based on her professional experience and knowledge of the DOT and the underlying jobs data based on the RFC limitations in this case? If not, what process did the VE use to confirm that the underlying data was checked against the requirements of the DOT jobs to match the hypotheticals. *See, e.g., Amy D. v. Kijakazi*, 21 C 1646, 2023 WL 2242005, at *12 (N.D. Ill. Feb. 27, 2023) (finding VE's "process by which she arrived at her job numbers was 'cogent and thorough,' particularly in response to the ALJ's questions ensuring that the VE confirmed the underlying data was checked against the requirements of the DOT codes to match the hypotheticals" and testified to the process she used to "minimize over inclusive jobs"). The VE did not testify that she found that SkillTRAN produced reliable job numbers with consistent results "by, for example, drawing on her past experiences with the method or knowledge of job markets." *Ruenger*, 23 F.4th at 764 (citing *Chavez*, 895 F.3d at 969). She did not provide any explanation for why she had a "reasonable degree of confidence in [her] estimates." *Chavez*, 895 F.3d at 969; *see Rennaker v. Saul*, 820 Fed. App'x. 474, 479 (7th Cir. 2020) (unpublished) ("[A]lthough a VE may draw from his expertise to provide a reasoned basis for his job-number estimates, [ ] the VE in this case did not bring any aspect of his experience to bear on the reliability of those numbers. He did not say *why* he thought his numbers were reliable.") (emphasis in original).

The Commissioner disagrees, arguing that this case is similar to *Bruno*, 817 Fed. App'x 238, where the Seventh Circuit affirmed the VE's use of SkillTRAN. Def.'s Resp. at 10, Dkt. 17. This Court finds *Bruno* distinguishable because the VE in that case explained his methodology, namely the "SkillTRAN approach" and explained how he used the underlying jobs data organized

by broader SOC codes along with other data identifying jobs by industry to calculate the number of DOT jobs based on skill and exertional level. *Bruno*, 817 Fed. App'x at 243. Here, although the VE relied on SkillTRAN, which utilized BLS data to estimate DOT jobs, the VE did not explain how she used the job numbers provided by SkillTRAN to calculate the jobs Plaintiff could perform.

Nevertheless, in arguing that the VE properly described her methods, the Commissioner states that the VE "had significant experience in SkillTRAN and found it reliable, and the VE also explained how the product functions." Def.'s Resp. at 12, Dkt. 17 (citing R. 1546–48). But other than stating that she understood how SkillTRAN works and that she found it reliable, the VE offered no insight into how she utilized SkillTRAN, and the other sources she relied on, to calculate her job numbers.

The Commissioner also points out that SkillTRAN publicly posts its methodology online and that the VE understood this methodology. However, this alone does not otherwise support that the VE utilized a reliable methodology. Not only did the VE fail to explain her methodology, such that the ALJ could evaluate it, but the ALJ also did not evaluate the methodology SkillTRAN posted on their website. Instead, the ALJ assumed, without explanation, that because the VE understood how SkillTRAN worked her method for estimating jobs numbers must be reliable. *See Westendorf*, 2020 WL 4381991, at *3 (remanding where the ALJ did not evaluate Job Browser Pro's method outlined on its website and instead "simply parroted the VE's assertions that Job Browser Pro relies on government data, that it is commonly used by vocational consultants, and that it is available for public use. None of that is shows that the methodology is reliable.").

Throughout her brief, the Commissioner also faults Plaintiff's counsel for not asking the VE about her methodology despite the lengthy cross-examination. Def.'s Resp. at 12, Dkt. 17. The ALJ similarly faults Plaintiff's counsel. In her decision, the ALJ found it important to note that:

"claimant's representative presented no evidence, nor offered to present evidence directed to refute the testimony of the vocational expert. Moreover, the representative intended to extend the hearing by asking questions that offered no relevance into the issues considered herein." R. 1512 n.4. The ALJ further stated:

> The undersigned notes that the representative raised these issues in prior hearings on the matter and even with the Appeals Council. The remand in this case was to address particular medical related issues, not the vocational testimony. Regardless, the undersigned presented questions anew to the vocational expert to update the testimony in the most recent hearing. Questioning as to pertinent, relevant matters were allowed. Repetitive, irrelevant, and tenuous questions and topics do not support an extraordinary allowance for another supplemental hearing to re-tread over the same topics (25E; 33E; 3/10/21 hearing; 7/20/21 hearing; 6/21/22 hearing).

R. 1513.

However, regardless of the somewhat unguided questioning by Plaintiff's counsel, the Commissioner, and the ALJ, attempt to improperly shift the burden to identify jobs to Plaintiff. It was the ALJ who failed to elicit testimony from the VE about her methodology, despite Plaintiff's counsel raising the issue of the VE's methodology before, during, and after the hearing before the ALJ.[3] The ALJ overruled these objections, despite failing to elicit testimony from the VE on precisely what method (not sources) she used to estimate her job numbers and why she believed that method produced reliable job number estimates. The ALJ's questioning of the VE revealed only that the VE relied on her own experience, the DOT, the BLS, and Job Browser Pro to provide the job number estimates, that she believed these sources were widely used by VEs and reliable, and that she received training on using the Job Browser Pro. This is not enough under the substantial evidence standard.

---

[3] The Commissioner curiously argues that the ALJ's reliance on the VE's testimony is compatible with the holdings in other circuits. Def.'s Resp. at 8, Dkt. 17 (noting that other circuits have found that once the ALJ meets its limited burden to establish significant jobs "the onus shifts back to the claimant to establish some kind of meaningful uncertainty with the vocational expert's testimony"). Even considering the holdings in other circuits, the ALJ has not met its limited burden in this case.

When Plaintiff's counsel attempted to question the VE about her methods, the ALJ cut the cross-examination short. The ALJ did not want to "re-tread over the same topics" that were addressed at prior hearings. However, at the two prior hearings, a different VE testified. In her decision, the ALJ relied on the newest VE's testimony and job number estimates, not those from the earlier hearing. Additionally, the ALJ points out that the Appeals Council remand was to consider additional medical evidence relating to Plaintiff's RFC. However, the Appeals Council ordered the ALJ to obtain supplemental vocational evidence if warranted. The ALJ did so and relied on testimony from a new VE to support the job numbers. Yet, the ALJ made no attempt to elicit a reasoned explanation of the methodology used to produce the estimated job numbers. Instead, she blindly accepted the VE's testimony that such methodology was reliable.

The Commissioner also briefly argues that Plaintiff's challenges are unsupported by controlling law, noting that this Court should not be persuaded by Plaintiff's reliance on *Russell v. Berryhill*, 16-CV-1251-JPG-CJP, 2017 WL 3704354, at *5 (S.D. Ill. Aug. 28, 2017), where the court remanded because "the VE testified that she relied on information from SkillTRAN software for the job numbers, and the ALJ did nothing to establish that SkillTRAN information is reliable." The Commissioner asserts that the same argument in *Russell* has been rejected by another district court and has been effectively overruled by *Biestek*, 139 S. Ct. at 1152. However, in the district court case that the Commissioner relies on, the court rejected the argument in *Russell* because Plaintiff did not object to the VE's methodology at the hearing. *See David E. v. Saul*, 18 C 727, 2019 WL 4034496, at *10 (N.D. Ill. Aug. 27, 2019). That is not the case here. Additionally, even if *Russell* has been overruled by *Biestek*, the Court in *Biestek* still found that, "an applicant may probe the strength of testimony by asking an expert about (for example) her sources and methods— where she got the information at issue and how she analyzed it and derived her conclusions."

11

*Biestek*, 139 S. Ct. at 1156. That is precisely what Plaintiff's counsel attempted to do here regarding the VE's methods, but questioning was cut short before the VE could explain "how she analyzed [the information] and derived her conclusions." *Id.*

Although this will be the third remand in this case, the Seventh Circuit has admonished ALJs of their duty to spend time inquiring into the VE's methodology:

> "We are mindful of the time constraints and heavy caseloads faced by ALJs. But when a claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology. *See Chavez*, 895 F.3d at 970. This may require that ALJs ask more questions of vocational experts or slow down proceedings to give claimants a greater opportunity to pose their own questions. Otherwise, ALJs risk shifting the agency's evidentiary burden to the claimant. *Id.*"

*Ruenger*, 23 F.4th at 764.

Accordingly, because the ALJ failed to elicit a "reasoned and principled explanation" of the methodology the VE used to reach the job numbers provided, a remand is required because the ALJ and this Court are unable "ensure that the approximation [of job numbers] is the product of a reliable method." *Chavez*, 895 F.3d at 968, 970; *see Ruenger*, 23 F.4th at 765 ("Because the expert failed to set forth an understandable methodology, we cannot review her methodology, let alone confirm that it was reliable."). In remanding this case, the Court is not indicating that there is no work in significant numbers that Plaintiff can perform. Rather, the basis for the VE's job numbers should be explored more thoroughly so the ALJ can make a determination that significant jobs exist based on substantial evidence. In light of this Court's remand, it will not address Plaintiff's remaining arguments. However, Plaintiff's counsel should raise all issues argued on appeal with the ALJ on remand, both in a pre-hearing brief and at the administrative hearing. Failure to explicitly raise these issues may result in a waiver if this case is again appealed to this Court.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, and the Commissioner's motion is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceeding consistent with this opinion.

Date: September 6, 2023          By: _____

Lisa A. Jensen
United States Magistrate Judge